IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

LAWRENCE NORTHERN,

                              Plaintiff,

            v.                                          OPINION and ORDER

ANTHONY HENTZ, PAULINE HULSTEIN,                        19-cv-866-jdp
and TAMMY MAASSEN,

                              Defendants.

---

Plaintiff Lawrence Northern, appearing pro se, is a prisoner at Jackson Correctional Institution. Northern alleges that defendant prison staff members failed to properly treat him when he complained about problems breathing, even after he was diagnosed with asthma. He brings claims under the Eighth Amendment to the United States Constitution and Wisconsin medical negligence law.

Defendants have moved for summary judgment. I will grant the motion on Northern's Eighth Amendment claims because Northern fails to adduce evidence that defendants consciously disregarded his medical needs. I will relinquish the court's supplemental jurisdiction over Northern's state-law claims.

PRELIMINARY MATTERS

I begin with some preliminary motions.

**A. Motion to reinstate dismissed defendants Dobson and Miller**

Northern's active claims are against defendants Anthony Hentz, Pauline Hulstein, and Tammy Maassen. I had also granted Northern leave to proceed on claims against Mary Dobson and Patricia Miller for failing to timely refill Northern's albuterol prescription. After the

Wisconsin Department of Justice did not accept service for Dobson and Miller, the court directed Northern to obtain service on them himself. Dkt. 8. I dismissed Dobson and Miller from the case almost a year later after Northern's continued failure to serve them or show good cause or excusable neglect. Dkt. 16. I later denied his motion to reconsider the dismissal. Dkt. 38. Northern followed with a motion asking for an extension of time to file his summary judgment opposition in part because of his desire to reinstate Dobson and Miller, Dkt. 39, along with a submission attaching receipts for failed March 2022 attempts to serve Dobson and Miller, Dkt. 41.

I will deny Northern's latest request to reinstate Dobson and Miller as defendants. Northern has already been given multiple chances to serve Dobson and Miller, and it is far too late in the schedule to do so now. And in any event Northern has still not shown that he can successfully serve them. His motion for extension of time to file his summary judgment opposition is otherwise moot because he ultimately filed response materials within the deadline originally set by the court.

**B. Motion to compel discovery**

After Northern filed his summary judgment opposition materials, he filed a motion to compel discovery. Dkt. 52. Northern also filed a motion for extension of time to file his reply brief supporting his motion to compel, along with his proposed reply. Dkt. 61 and Dkt. 62. I will grant his motion for extension of time and I will consider his reply brief. But I will deny each aspect of his motion to compel.

Northern seeks to compel defendants to disclose documents that he contends are responsive to several of his requests for production. Northern seeks prison medical staff's "respiratory protocol" in place at the time of the events relevant to this case, summer 2018.

Defendants respond that counsel requested the 2018 version of the policy twice from DOC staff but staff responded that the only version they still had was from 2021. Defendants provided Northern with this version, and they can't be forced to provide the older version to him if the DOC no longer possesses that version.

Northern seeks to compel disclosure of "any and all" memos created by defendant Health Services Manager Maassen from 2018 to 2021. Defendants objected to Northern's initial request as overly broad and asked him to narrow his request. Northern did not narrow his request; in his motion to compel he continues to ask for the full set of memos, stating that he needs them to prove that Maassen failed to train nursing staff in responding to inmates' medical problems. Defendants continue to contend that the request is too broad. They add that most of the responsive material wouldn't be relevant to Northern's care and that memos about other inmates' care would contain those inmates' confidential health information. I agree with defendants that Northern doesn't adequately explain how three years' worth of memos—without any sort of restriction on the subject matter of that material—is necessary to support his failure-to-train claim. I will deny this portion of his motion to compel.

Northern requested all emails about him from 2018 to 2021 issued by 11 DOC staff members, including Hentz, Hulstein, and Maassen. Defendants objected to this category of documents as overly broad but did search through its email database using various keywords like "Northern" and "asthma" from May to December 2018 and produced those documents to Northern. Dkt. 53-1. Northern wrote to defendants, stating that their response was inadequate and specifically asking for emails related to his grievance No. JCI-2018-10709. Defendants again objected, stating that his request was overly broad and that the '10709 grievance was not about asthma care. Dkt. 53-1. Regardless of their objections, defendants did run keyword

searches that would have caught any relevant emails for the times material to this case, including that pendency of the '10709 grievance. So I will deny this portion of Northern's motion to compel.

## C. Expert testimony

Defendants submitted their expert disclosure on the deadline for doing so, February 11, 2022. Dkt. 20. But 11 days later, in conjunction with their motion for an extension of time to file dispositive motions, defendants amended their disclosure to include another non-retained expert, Advanced Practice Nurse Prescriber Debra Tidquist. Dkt. 23. Tidquist worked at Jackson Correctional Institution and treated Northern at the very early stages of the events underlying this case, although not directly on his breathing-related complaints. She is not a defendant.

Defendants sought an extension of the dispositive motions deadline because Tidquist had recently left the Department of Corrections and was "unavailable to finalize submissions." Dkt. 21, at 1. The court granted an extension of the dispositive motions deadline, and defendants later submitted their summary judgment materials, in part relying on Tidquist's testimony recounting entries in Northern's medical file (regardless whether she was the provider meeting with Northern for specific entries), explaining internal prison medical-unit policies, explaining some of the medical concepts at issue in the case, and giving her opinions that Northern's asthma was not severe and that he was not harmed by any of the alleged delays in medical care. *See* Dkt. 23 (amended expert disclosure); Dkt. 33 (Tidquist's declaration).

Northern objected to Tidquist's testimony, arguing that she does not have personal knowledge of his asthma because she was not involved with his asthma treatment. Dkt. 26. He followed with a motion to strike Tidquist's declaration and defendants' motion for summary

4

judgment because it relies so heavily on her declaration. Dkt. 36. He argues that Tidquist is not a "hybrid fact-and-expert witness"—a witness who was personally involved with the facts of the case and offers opinions formed during the events at issue—because she wasn't involved in his asthma treatment. And he argues that she cannot opine on asthma care because she isn't licensed in pulmonology.

Rather than defend Tidquist's designation as a non-retained expert, defendants request leave to again amend their expert disclosures to designate Tidquist as a retained expert. They submit an amended declaration attempting to fulfill Rule 26's requirements for retained-expert disclosures. *See* Dkt. 48 (second amended expert disclosure); Dkt. 49 (Tidquist's amended declaration). In particular, defendants now include a section on Tidquist's qualifications, such as degrees, certifications, and professional positions, and they state that Tidquist has not testified as an expert in any cases over the last four years and that they are not compensating her. Defendants also argue that Tidquist is qualified to testify about issues relating to asthma here because this case involves interventions by nursing staff, about which Tidquist has expertise. I will allow defendants to amend their submissions so that I can consider the new filings as defendants' operative disclosures. But that does not fully resolve the parties' disagreements.

To start with, a substantial portion of Tidquist's declaration is not expert testimony. Courts routinely admit medical records under Rule 803(6), which applies to business records, *LaBrec v. Wisconsin & S. R.R. Co.*, No. 17-cv-828-jdp, 2019 WL 325131, at *2 (W.D. Wis. Jan. 25, 2019), so I won't strike the information that Tidquist recounts from those records. Tidquist also testifies about the inner workings of the prison medical unit, in particular how orders for

5

prescriptions are routed and how referrals to outside providers are made. That is not expert testimony and she is free to testify about those facts as a former employee at the prison.

But I agree with Northern that much of Tidquist's testimony is that of a retained expert, not merely a hybrid fact-and-expert witness offering opinions formed during the events she was directly involved in. It is clear that she has been asked to testify as an expert about asthma and opine about the severity of Northern's symptoms, standards of care, and Northern's treatment despite not being present for those events. It doesn't matter that Tidquist is offering her expert testimony for free. *Avnet, Inc. v. Motio, Inc.*, No. 12 CV 2100, 2016 WL 927194, at \*5 (N.D. Ill. Mar. 4, 2016) ("We also reject Defendant's argument that Mr. Moore was not 'specially employed' to offer expert testimony. We do not read this phrase to mean 'hired' . . . . [A] more natural reading of 'specially employed' is that of a person who is not a percipient witness but who is being specially 'used' to offer expert testimony."). Defendants appear to concede this point, and they have amended their expert disclosures to fulfill some of the technical requirements for a retained expert, such as disclosures relating to qualifications and Tidquist's previous experience testifying as an expert.

I will exclude Tidquist's proposed expert testimony at summary judgment. A first problem is that defendants waited until after Northern had filed his summary judgment opposition before submitting their amended disclosures to comply with the requirements for retained experts, giving Northern no real chance to challenge those parts of the disclosures. That alone might not disqualify the submissions because Northern already knew the gist of Tidquist's professional training and she didn't add publications or previous service as an expert for Northern to challenge.

But a second problem is that Tidquist mixes testimony about the facts of the case with her expert analysis, posing the risks of dual-role testimony described in *United States v. Jett*, 908 F.3d 252, 267–70 (7th Cir. 2018). *Jett* requires a dual-role witness to separate her testimony based on personal knowledge from her expert analysis. *Jett* deals primarily with presentation of dual-role testimony to the jury. But Tidquist's testimony raises similar problems at summary judgment because I cannot tell whether some of Tidquist's statements about the severity of Northern's asthma are her simply recounting information from medical records or her formulating her own expert opinion.

A third problem is that Tidquist's declaration does not adequately explain her expert conclusions. Northern argues that Tidquist cannot opine about his asthma because she isn't licensed in pulmonology. I disagree because an advanced practice nurse prescriber like Tidquist will have some training or experience with treating asthma. But Tidquist still does not provide enough explanation of the reasons for some of her opinions. For instance, Tidquist states that Northern's methacholine challenge test "indicated that Northern was at the very low end of what was necessary to be diagnosed with asthma," Dkt. 49, ¶ 38, but she doesn't explain how she knows this, and it is not apparent from the face of the corresponding medical records. Tidquist also says that based on the medical records, there wasn't any instance in which Northern required emergency care. But she doesn't explain what in the records makes this clear, or what would have to have been included in the records to show a need for emergency care. The medical records are also not the sole source of facts regarding Northern's symptoms. Northern provides his own account of events, including episodes he describes as asthma attacks, and Tidquist doesn't grapple with that account. Without a more detailed analysis of the specific reasons for Tidquist concluding that Northern's asthma was mild, I cannot credit

7

her expert testimony about the severity of his asthma. So I will grant Northern's motion to strike Tidquist's testimony on that issue.

UNDISPUTED FACTS

The following facts are drawn from the parties' proposed findings of fact and supporting medical records and are undisputed unless otherwise noted.

Plaintiff Lawrence Northern is incarcerated at Jackson Correctional Institution (JCI). All of the defendants worked at JCI. Anthony Hentz and Pauline Hulstein were nurses. Tammy Maassen was the health service manager; in that position she supervised the nurses but not the "advanced care providers" such as doctors and advanced practice nurse prescribers.

On June 10, 2018, Northern filed a health service request stating that a blood pressure medication he was taking called lisinopril was causing him an "unbearable" cough and that his chest still hurt (Northern had previously been treated for chest pain). In the two months preceding this complaint, Northern had been seen several times by medical staff with no indication of respiratory problems. Non-defendant Dr. Lily Liu responded, stating that she would see Northern later that week.

Defendant Nurse Hentz saw Northern two days after his request. Hentz's notes stated that Northern breathed easy and was not coughing. Hentz's note states that he followed the prison's "respiratory protocol" in treating Northern, but the parties dispute whether Hentz actually physically examined his lungs. Northern signed a Refusal of Recommended Health Care form stating that he would no longer take lisinopril because it caused him to cough and choke. Northern contends that Hentz failed to adequately treat him at this appointment.

Dr. Liu met with Northern on June 22 and ordered an off-site visit for Northern to take a "methacholine challenge" test for asthma. When an advanced care provider such as Dr. Liu refers a patient to an outside provider, a nurse reviews the order and alerts a staff member called a medical program assistant associate, who contacts the appropriate off-site clinic and schedules an appointment. The scheduling times for inmates' off-site visits are comparable to wait times for non-incarcerated persons, meaning that it can take several months or more to obtain an appointment for a non-urgent treatment.

In this case, there is no evidence that the medical program assistant associate scheduled an appointment for the methacholine challenge test order by Dr. Liu. Northern interprets the medical records to say that a non-defendant nurse reviewed the off-site request and marked it to be routed to the medical program assistant associate, who then failed to schedule the test. But the exact reason for the failure to schedule an appointment is immaterial to Northern's claims.

This isn't the first time that JCI staff had failed to timely schedule an off-site appointment for Northern. In April 2018, Northern was ordered an off-site appointment for an exercise stress test in response to his complaints of chest pain and headaches, but a nurse did not forward that order to the medical program assistant associate. Two weeks later, a second order for a stress test was issued and the test was successfully scheduled. Northern won an inmate grievance about the failure to execute the first order. A courtesy copy of that outcome was sent to defendant Maassen to review with nursing staff. Part of Northern's claims against Maassen is that she allowed her staff to fail to schedule the methacholine challenge test even after being warned about a similar problem with his stress test.

On July 31, Northern submitted a health service request complaining of a choking cough and asking about the methacholine challenge test. Defendant Hentz responded three days later that "[t]he above testing is to be scheduled." Dkt. 46-5, at 10. Three days after that Northern filed another health service request directed at Maassen, asking why the methacholine challenge test had not yet been scheduled. Hentz responded the next day, stating "I told you it is to be scheduled." Dkt. 46-6, at 1.[1] Northern brings claims about these responses by Hentz, contending that Hentz treated him like a "nuisance" instead of a patient.

The parties agree that a second methacholine challenge test was scheduled around this time but disagree on when that happened. Northern says that it was scheduled on August 3, after Hentz's response to his July 31 health service request. Defendants say that Dr. Liu ordered the test on August 8, after both of Hentz's responses to Northern.

On August 21, 2018, Northern went to Black River Memorial Hospital for the methacholine challenge test. The test simulates an asthma attack to see how reactive or responsive a patient's lungs are. The summary completed the day of the test stated that Northern did suffer asthma symptoms during the test and that albuterol improved his breathing.

Northern returned to JCI and was escorted to the Heath Services Unit. While there, he encountered defendant Nurse Hentz, who had been given an envelope with the summary of the methacholine challenge test. Northern's breathing became labored and included wheezing. Northern states that "without even looking," Hentz told him to go take his blood pressure medicine. Dkt. 46, ¶ 50. Hentz did not examine him or send him to see a doctor. Northern

---

[1] Defendants contend that Hentz's response is illegible, but I agree that it says what Northern says it does.

returned to his cell in "debilitating" pain that "left [him] lying on the floor of [his] cell gasping for air." *Id.*, ¶ 51. Northern brings claims against Hentz for failing to adequately treat him that day.

Defendants contend that this August 21 interaction did not occur. They state that Northern's scheduled August 21 methacholine challenge test was not completed that day, that he returned to the hospital the next day for the test, that there is no record of an interaction between Hentz and Northern on August 22, and that Northern does not say that he suffered an asthma attack that next day. But the off-site medical records for Northern's methacholine challenge test are dated August 21, a day that Northern does say that he had an asthma attack. That evidence and Northern's sworn statement that he interacted with Hentz on August 21 creates a disputed issue of material fact that I will view in Northern's favor for purposes of defendants' summary judgment motion.

Days later a respiratory specialist at the hospital reviewed Northern's test results and found that they were "consistent with underlying asthma as long as the patient's clinical presentation coincides with this diagnosis. Clinical correction is warranted." Dkt. 33-1, at 12.

Between the date of the methacholine challenge test and September 18, 2018, Northern did not submit any health service requests complaining that he was experiencing any breathing discomfort or complications from asthma. On September 18, Northern submitted a request in which he complained of chest pain and a choking cough. On September 20, Northern was seen by Dr. Liu regarding his asthma. Liu prescribed him an albuterol inhaler, to be used four times a day as needed for shortness of breath or wheezing.

When a medication is needed for urgent reasons, an advanced care provider will mark the medication as a "STAT" order. STAT orders are processed immediately: staff will

immediately pull the medication from the prison's medication room if it is in stock or obtain it from a local pharmacy. Non-urgent medications are dispensed by the DOC's central pharmacy after the prescriptions are checked for dosage amount, potential for misuse or abuse, and contraindications. Those medications are ordinarily dispensed within four days. Non-prescription medications are ordinarily dispensed by the prison's medication room within seven days of the order.

After being prescribed the albuterol inhaler, Northern asked the medication room for it several times, only to be told that they didn't have one for him or that the central pharmacy was processing it. Prison medical records show that Northern was provided an inhaler on September 24, four days after it was prescribed. Northern disputes this, saying that he did not receive an inhaler that day. On September 26, Northern submitted a health service request—that he labeled as an "informal grievance"—stating that it "should not have taken 4 days to get an Asthma Inhaler," and that an inhaler should have been dispensed immediately. Dkt. 46-9, at 4. Defendant Hulstein responded, "[t]he Med room has seven (7) days to get your medication out to you unless it's a special order. Please plan accordingly." *Id.* The medication room has "rescue" inhalers available for emergencies, but Hulstein did not give him one. It is undisputed that Northern eventually received an inhaler on October 1. Northern brings claims against Hulstein for failing to get him an inhaler sooner.

If a prisoner patient anticipates running out of a prescribed medication, the prisoner is expected to place a refill request for that medication far enough in advance to not run out. Inmates are told they should request refills seven days ahead of time. On November 3, 2018, Northern submitted a request to refill his inhaler, stating that he had only 37 pumps left. Within the next couple of days he filed another refill request and a health service request stating

12

that his albuterol had run out. Northern received a refill on November 7. The parties dispute where that refill came from. Defendants say that it came from the DOC's central pharmacy; Northern presents an email between DOC staff stating that the refill came from the prison's emergency supply. Part of Northern's claims against defendant Maassen is that the nursing employees she supervised did not give him his prescribed albuterol quickly enough.

Northern says that because of defendants' delays in adequately treating him, he suffered about ten asthma attacks over the several-month course of events discussed here.

I will discuss additional facts as they become relevant to the analysis.

ANALYSIS

**A.  Eighth Amendment claims**

Northern contends that defendants' delays in treating his breathing problems violated his rights under the Eighth Amendment to the United States Constitution. The Eighth Amendment prohibits prison officials from consciously disregarding prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of

the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Northern was diagnosed with asthma and he states that he often had difficulty breathing and that he suffered multiple asthma attacks during the times of the events in question. Relying on Tidquist's expert testimony, defendants say that Northern's asthma was not a serious medical need. But I am disregarding Tidquist's expert testimony, so for purposes of this opinion I will assume that Northern's asthma was a serious medical need. That said, the relevant question for Northern's various Eighth Amendment claims is whether a particular defendant was aware that Northern had a serious medical need at the time they made the decisions relevant to his claims.

### 1. Defendant Hentz

Northern contends that defendant Nurse Hentz provided him inadequate care at three points of his treatment. His first allegation is that Hentz refused to treat him at his June 12, 2018 appointment. He states that after he filed a health service request complaining about a bad cough caused by his lisinopril, Hentz saw him but did not conduct a physical exam of his lungs or immediately direct him to Dr. Liu; instead he had Northern sign a "refusal of care" form. When I screened the complaint, I took Northern to be alleging that he did not actually refuse care from Hentz even though Hentz made him fill out the refusal form. Dkt. 4, at 2. But at summary judgment, it is undisputed that the refusal-of-care form was meant to confirm that

14

Northern was refusing to continue taking lisinopril because of the side effects, not that Hentz refused care that Northern was asking for.

At the appointment, Hentz noted that Northern's cough was there only "a little bit but overall better." Dkt. 46-3, at 10, and he noted that Northern was scheduled for a follow up with Dr. Liu. Northern argues that Hentz could have done more to examine him, such as conduct a "peak flow meter" test or Spirometry test or send him immediately to Liu. But Hentz was seeing him directly for his complaint about a cough and wheezing as side effects of his lisinopril, and Hentz did address that concern by observing his cough and having Northern document his quitting the lisinopril because of the side effects. Northern is really arguing that Hentz didn't go further to assess whether there was a *second* cause of Northern's cough or wheezing. But Hentz's failure to provide further care even after he thought that he had solved the problem by discontinuing the lisinopril is at most a medical malpractice question; it does not show that Hentz consciously disregarded the problem that Northern came to him with.

After Northern continued to complain of chest pain and headaches, he was seen by Dr. Liu, who ordered an off-site methacholine challenge test for asthma. But Northern didn't immediately receive the test. Northern's second Eighth Amendment claim against Hentz is for Hentz's delay in arranging for the test.

At summary judgment it is undisputed that Hentz was not the prison official directly responsible for scheduling off-site appointments. But Northern says that Hentz disregarded the delays as the official responding to Northern's two early August 2018 health requests stating that he had a choking cough and asking about when he would have the methacholine challenge test. Hentz responded to Northern's requests by stating that the test still needed to

15

be scheduled. Northern argues that this shows that Hentz disregarded him by treating him like a "nuisance" instead of patient.

But again, Hentz wasn't the prison official responsible for scheduling off-site appointments. There is no evidence that Hentz checked on the status of others' efforts to schedule the methacholine challenge test, but a failure to do so under these circumstances wouldn't be enough for a reasonable jury to conclude that Hentz consciously disregarded Northern's condition. The delay that Northern complained of—about six weeks by the time of his complaints—was commonplace for off-site appointments. So Northern doesn't present evidence suggesting that Hentz was aware that the appointment was being held up due to a problem in the DOC chain of command yet disregarded that problem. And it is undisputed that the methacholine challenge test was ultimately scheduled within a week of Northern's first complaint to Hentz—according to Northern, the day after. So Hentz's contribution to the delay doesn't appear to have had a material effect on the Northern's asthma treatment. I will grant summary judgment to defendants on this Eighth Amendment claim against Hentz.

Northern's third Eighth Amendment claim against Hentz is for an interaction they had as Northern returned to the prison from his methacholine challenge test. Hentz was given an envelope containing the "Off-Site Services and Report" form filled out by the off-site provider. Northern's breathing became labored with wheezing, and he asked for a doctor. But Hentz didn't examine Northern or refer him to a doctor; instead he told him to take his blood pressure medication.

Northern fails to produce evidence that could lead a reasonable juror to conclude that Hentz violated his Eighth Amendment rights with regard to this interaction. Northern doesn't discuss this incident in his brief, but from his proposed findings of fact he appears to be arguing

that Hentz should have opened the envelope containing the off-site provider form he had been handed. It is unclear whether Hentz did so during their interaction. But in any event, the off-site form did not include a prescription for albuterol or even contain a formal diagnosis of asthma—it was days later that the off-site specialist issued the formal test results stating that Northern's symptoms during the methacholine challenge test were consistent with asthma. And as a nurse, Hentz could not order an inhaler himself. Northern states that he returned to his cell in severe pain and lying on the floor of his cell gasping for air. But he doesn't say that he reported those more severe symptoms to Hentz. Instead he said that in his meeting with Hentz he had labored breathing and wheezing, consistent with his previous complaints that had not required immediate medical intervention.

The off-site form that Northern believes that Hentz should have read did contain a recommendation, but it was about Northern's high blood pressure: Northern had forgotten to take his blood pressure medication that morning and he had elevated blood pressure at the methacholine challenge test. Dkt. 46-6, at 10. Hentz did tell Northern to take his blood pressure medication, which suggests that Hentz looked at the form and followed through on the issue discussed in the recommendation section. Hentz's decision to focus on Northern's blood pressure problem rather than seek immediate help for his labored breathing might show that Hentz was negligent in this interaction. But no reasonable jury could conclude that Hentz consciously disregarded Northern's condition. So I will grant defendants' motion for summary judgment on this claim.

### 2.  Defendant Nurse Hulstein

Northern also brings an Eighth Amendment claim against defendant Nurse Hulstein. In his summary judgment opposition, Northern discusses a September 10, 2018 appointment

with Hulstein in which he had difficulty breathing; Hulstein responded by putting him on the "doctor's list" rather than give him an inhaler or send him directly to the doctor. But in screening the complaint I rejected this Eighth Amendment claim because Northern wasn't suffering from an emergency asthma attack requiring immediate care and he had not yet been prescribed an inhaler. So I won't discuss this incident further.

The claim that I allowed Northern to proceed on against Hulstein is her alleged 10-day delay in giving him an inhaler following Dr. Liu prescribing him one on September 20. More specifically, on September 26, 2018, Northern submitted a health service request—that he labeled as an "informal grievance"— stating that it "should not have taken 4 days to get an Asthma Inhaler," and that an inhaler should have been dispensed immediately. Dkt. 46-9, at 4. Hulstein responded, "[t]he Med room has seven (7) days to get your medication out to you unless it's a special order. Please plan accordingly." *Id.* Northern contends that Hulstein invoked this "seven-day rule" as an excuse to "take her own sweet time" to delay dispensing the albuterol inhaler even though emergency inhalers were readily available from the medication room. Dkt. 46, ¶ 64.

Northern's argues that the inhaler should have been dispensed immediately, but it is undisputed that Dr. Liu didn't prescribe the inhaler as a "STAT" emergency order, so there wasn't any reason for staff to diverge from the ordinary processing times for a prescription. Even so, Northern contends that Hulstein played a role in the 10-day delay in receiving an inhaler, which was beyond the ordinary medication-processing time. But the prison medical records show that Northern was first given an inhaler (by someone other than Hulstein) on September 24, only four days after Liu's prescription and two days *before* Northern sent his request to Hulstein. Northern says that he did not receive an inhaler on September 24. But for

18

Northern's claim against Hulstein, the objective truth of when he actually received his first inhaler is irrelevant; the question is whether Hulstein was aware of a serious medical need and disregarded that need.

Based on the evidence here, no reasonable jury could conclude that Hulstein thought that Northern still needed an inhaler at the time he filed his request—his medical records showed that he had already received an inhaler two days before. And Northern's "informal grievance" did not say that he was still waiting for an inhaler; he stated that it "should not have taken 4 days" to get an inhaler, consistent with the record showing that Northern had already received an inhaler after four days. In short, the only reasonable inference is that Hulstein thought that she was responding to a complaint about past harm caused by a four-day delay that had already ended with Northern receiving an inhaler, not a complaint that Northern was still waiting for an inhaler almost a week after Dr. Liu prescribed it. Because Northern doesn't show that Hulstein consciously disregarded Northern's medical needs, I will grant summary judgment to defendants on this claim.

### 3. Defendant Maassen

I granted Northern leave to proceed on an Eighth Amendment claim against defendant Health Service Manager Maassen for failing to train nursing staff or turning a blind eye to a pattern of misconduct similar to the alleged delays in him receiving his methacholine challenge test and albuterol inhalers.

Supervisors can be liable under the Eighth Amendment for ignoring serious risks to prisoners that are brought to their attention. *See Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (supervisors could be personally involved in a constitutional deprivation if they "know about the conduct and facilitate it, approve it, condone it, or turn a

19

blind eye for fear of what they might see"); *see also Sinn v. Lemmon*, 911 F.3d 412, 423 (7th Cir. 2018) (policy-setting officials can be liable if "they are aware of a systematic lapse in enforcement of a policy critical to ensuring inmate safety yet fail to enforce that policy" (internal quotations omitted)). Supervisors may also be liable under for failing to train their employees. *Kitzman-Kelley v. Warner*, 203 F.3d 454, 459 (7th Cir. 2000). But to be liable the supervisor must know that her training is so inadequate that employees are likely to violate the Constitution as a result. *Ghashiyah v. Frank*, No. 07-C-308, 2007 WL 5517455, at *2 (W.D. Wis. Aug. 1, 2007) (citing *Mombourquette ex rel. Mombourquette v. Amundson*, 469 F. Supp. 2d 624, 651 (W.D. Wis. 2007)).

Regarding the failure of nursing staff to schedule Northern's methacholine challenge test, Northern contends that Maassen "was on notice of a widespread practice at JCI of nursing staff ignoring [advanced care provider] orders for off-site medical care." Dkt. 51, at 6. For evidence of this widespread practice he cites the failure of staff to follow through on his first order for a stress test in April 2018, and he produces a list of ten grievances that JCI inmates won regarding delays in treatment. *See* Dkt. 46, ¶ 18. But those grievances took place from 2017 to 2021 and only one of them (from March 2017) both predated Northern's summer 2018 methacholine challenge test delay and was about a delay simar to the problem here: delays in obtaining an off-site visit. One March 2017 incident involving another inmate and Northern's own May 2018 incident regarding the stress test simply aren't enough to suggest that Maassen was aware of a widespread practice of medical staff ignoring or missing orders for off-site treatment. *See Sinn*, 911 F.3d at 423 ("an inmate cannot show a 'widespread practice of an unconstitutional nature,' such as a custom of ignoring prison policy, by pointing to 'isolated incidents of [misconduct]'" (quoting *Palmer v. Marion County*, 327 F.3d 588, 597 (7th

Cir. 2003))). So no reasonable jury could conclude that Maassen consciously disregarded a serious risk to inmates' health.

Northern also blames Maassen for repeated delays in the provision of his albuterol inhalers, but he doesn't show how Maassen was responsible for alleged delays in receiving his inhalers; in particular he does not explain that Maassen was aware of the delays and yet failed to address the problem. Maassen cannot be held liable for a constitutional claim merely because she supervised the medical staff that Northern says failed him. *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) ("For constitutional violations under § 1983, a government official is only liable for his or her own misconduct. There is no such thing as respondeat superior liability for government officials." (internal quotations and citation omitted)); *see also Slabon v. Sanchez*, No. 15-CV-08965, 2020 WL 5763760, at *18 (N.D. Ill. Sept. 28, 2020) ("'The buck stops here,' standing alone, is not a basis to impose personal liability under section 1983."). So I will grant defendants' motion for summary judgment on this claim.

## B.  Negligence claims

Northern also brings Wisconsin-law negligence claims against Hentz, Hulstein, and Maassen. The court would have supplemental jurisdiction over those claims under 28 U.S.C. §1367(a), which permits a federal district court to hear a state-law claim if it is related to a federal claim in the same action. Northern doesn't allege any other basis for federal jurisdiction over the state-law claims. Absent unusual circumstances, district courts will relinquish supplemental jurisdiction over state-law claims if all federal claims have been resolved before trial. *Coleman v. City of Peoria, Illinois*, 925 F.3d 336, 352 (7th Cir. 2019). Here, neither party identifies any unusual circumstances that would justify retaining jurisdiction over Northern's state-law claims now that I have granted summary judgment to defendants on all of Northern's

Eighth Amendment claims. I will decline to exercise subject matter jurisdiction over Northern's

state law claims. Northern may refile those claims in state court, subject to the applicable

Wisconsin statute of limitations.

ORDER

IT IS ORDERED that:

1. Plaintiff Lawrence Northern's motion to reinstate defendants Mary Dobson and Patricia Miller, Dkt. 39, is DENIED.

2. Plaintiff's motion for extension of time to file his summary judgment opposition, Dkt. 39, is DENIED as moot.

3. Plaintiff's motion for an extension of time to file his reply in support of his motion to compel discovery, Dkt. 61, is GRANTED.

4. Plaintiff's motion to compel discovery, Dkt. 52, is DENIED.

5. Defendants' motion for an extension of time to amend their expert disclosures, Dkt. 47, is GRANTED.

6. Plaintiff's motion to strike defendants' expert disclosures, Dkt. 36, is GRANTED in part.

7. Defendants' motion for summary judgment, Dkt. 29, is GRANTED with respect to plaintiff's Eighth Amendment claims.

8. Plaintiff's state law claims are DISMISSED without prejudice under 28 U.S.C. § 1367(c)(3).

9. The clerk of court is directed to enter judgment accordingly and close this case.

Entered July 18, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge